UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

MICHAEL DENO,

                    Plaintiff,

          v.

                                        8:12-CV-01263-WGY

CAROLYN W. COLVIN,
Acting Commissioner, Social
Security Administration,

                    Defendant.

_____

WILLIAM G. YOUNG, District Judge[1]          October 18, 2014

**<u>DECISION and ORDER</u>**

**I.    INTRODUCTION**

Michael Deno ("Deno") brings this action pursuant to

section 205(g) of the Social Security Act, 42 U.S.C. § 405(g),

seeking judicial review of the final decision of the

Commissioner of Social Security (the "Commissioner").  Deno

challenges the decision of the Administrative Law Judge (the

"hearing officer") denying him Supplemental Security Income

("SSI") benefits.  Deno requests that this Court reverse the

Commissioner's decision that Deno is not disabled.  Compl. 3,

ECF No. 1; Pl.'s SSI Br. ("Deno's Mem.") 36, ECF No. 12.  The

_____

          [1] Of the District of Massachusetts, sitting by designation.

Commissioner requests that this Court affirm the hearing officer's decision and grant her motion for judgment on the pleadings. Br. Supp. Comm'r's Mot. J. Pleadings ("Def.'s Mem."), ECF No. 13.

## A. Procedural Posture

On September 20, 2002, Deno filed a Title XVI application for SSI benefits. Soc. Sec. Admin. R./Tr. ("Admin. R.") 113-22, ECF No. 9.[2] Deno's application was initially denied on January 10, 2003, id. at 19-22, and Deno filed a timely request for a hearing by a hearing officer on February 4, 2003. Id. at 24-26, 60. Deno testified at a hearing held on October 21, 2004, and was represented by an attorney. Id. at 60. The hearing officer issued an unfavorable decision on November 24, 2004. Id. at 65. Deno subsequently filed a timely request for review on December 1, 2004, id. at 66-67, leading the Appeals Council to vacate the decision and remand the case. Id. at 68-71.

The hearing officer conducted the remand hearing on May 2, 2007, id. at 74, 504, and issued an unfavorable decision on June 27, 2007. Id. at 17. Deno then appealed the 2007 hearing officer's decision, id. at 7, and the Appeals Council denied

---

[2] Probably due to its size, ECF has divided the Administrative Record into three parts: record 9 (corresponding to pp. 1-303), record 9-1 (corresponding to pp. 304A-619), and 9-2 (corresponding to pp. 620-851).

Deno's request for review on February 19, 2009. Id. at 4-6.

Deno appealed the Appeals Council's denial to this Court on March 9, 2009. Def.'s Mem. 1. On August 26, 2009, this Court reversed and remanded Deno's claim to the Commissioner. Admin. R. 645-46; Deno v. Astrue, No. 90-cv-279 (N.D.N.Y. August 26, 2009) (Hurd, J.). On January 20, 2010, the Appeals Council remanded Deno's claim to a different hearing officer with instructions to resolve inconsistencies in the reports of Deno's primary care physician on March 30, 2006. Admin. R. 647-51. The hearing officer conducted the remand hearing on July 14, 2010. Id. at 820-51. On December 28, 2010, the hearing officer again denied Deno's claim. Id. at 630-44. Deno subsequently filed a timely request for review, which the Appeals Council denied on August 1, 2012. Id. at 572-75.

On August 10, 2012, Deno filed the present action to review the decision of the Commissioner pursuant to 42 U.S.C. §§ 405(g) and 1383(c). Compl. 1. The government filed an answer, Answer, ECF No. 8, and both sides filed briefs, Deno's Mem.; Def.'s Mem. On June 25, 2013, the case was reassigned to this Court. Order Reassigning Case, ECF No. 14.

**B.  Factual Background**

Deno was born on March 13, 1968. Admin. R. 507. Deno has a GED and has completed the ninth grade. Id. at 561. He worked

as a construction worker until 2000.  Id.  He was employed in
2007 as a light laborer through his brother.  Id. at 825-26.
Deno reported that he had a history of alcoholism but that he
has not had a drink in a number of years.  Id. at 789.  He is
able to read, cook for himself, shower himself, clean his home,
watch TV, focus on puzzles, go out, and occasionally go to the
store with the help of others.  Id. at 171, 836-40.  Deno has a
history of numerous physical impairments, including back and
spinal pain, stomach ulcers, anxiety, and depression.

### 1. Medical Evidence

The earliest sign of a physical impairment reflected in the
record occurred in February 1985, when Deno experienced
gastrointestinal bleeding.  Id. at 420.  On January 30, 1986,
Deno experienced dizziness and vomited blood.  Id.  He reported
to Dr. James Herbert at the Medical Center Hospital of Vermont,
where he was endoscoped and underwent surgery; during surgery,
forty percent of of Deno's stomach was removed.  Id. at 422-23.

From October 2001 to November 2002, Deno saw Dr. Barry
Kilbourne ("Dr. Kilbourne") for stomach pain.  Id. at 165-69.
On October 24, 2002, Dr. Kilbourne made the following
conclusions: Deno had (1) reflux and distal esophageal
irregularity, (2) irregular gastric fold thickening, and (3)
questionable jejunal thickening.  Id. at 319.  On October 30,

4

2002, Deno underwent a CT scan which reflected Deno's previous surgery and small bowel loops through the abdomen that "exhibit[ed] prominent caliber." Id. at 168. The CT scan revealed suture material projected over the junction of the neck and body of the pancreas, but Dr. Kilbourne concluded that this was probably just volume averaging artifact. Id. The CT scan showed no signs of pancreatic dilation, pancreatic masses, or biliary tree dilation. Id.

On December 13, 2002, Deno saw Dr. Nader Wassef ("Dr. Wassef"), an internist, for an internal medicine examination. Id. at 170-73. Deno told Dr. Wassef about the removal of part of his stomach in the 1980's, though he did not provide the doctor with corroborating medical records at that time. Id. at 170. Deno reported that he had been suffering from back pain for six months, which made it difficult for him to stand for long periods of time or climb stairs. Id. Deno added that he was able to do his own laundry, shop, socialize with friends, shower himself, read, and do crafts. Id. at 171. Dr. Wassef noted that Deno was physically normal in several capacities. He observed that Deno had normal blood pressure, ears, nose, throat, teeth, extremities, hand and finger dexterity, and a soft and non-tender abdomen. Id. at 172. The doctor also observed that Deno had the full range of motion in his cervical

spine and lumbar spine.  Id.  Dr. Wassef did, however, find some
tenderness in the left paralumbar area.  Id. at 172.  Dr. Wassef
noted that he observed no limitations based on the examination,
but suggested that Deno discuss his lower back pain with his
primary care physician.  Id. at 173.

On December 19, 2002, Deno had a lumbo-sacral spinal x-ray.
Id. at 174.  The x-ray revealed that Deno's disc space at the
L5-S1 region was narrowed.  Id.  The x-ray also showed (1) no
spondylolisthesis or spondylolysis, (2) mild "lipping", (3)
maintenance of the heights of the lumbar vertebral bodies, and
(4) the preservation of the lumbar lordotic curvature.  Id.

On January 3, 2003, Dr. Kilbourne completed a New York
State Office of Temporary and Disability Assistance form
diagnosing Deno with severe peptic ulcer disease and anemia.
Id. at 175-76.  Dr. Kilbourne found that Deno was moderately
limited in his ability to walk, stand, lift, carry, push, pull,
bend, see, hear, use his hands, or climb stairs.  Id. at 175.
He observed that Deno's mental functioning was unproblematic,
and he found no limitations of Deno's ability to understand and
remember instructions, maintain attention or concentration, make
simple decisions, interact appropriately with others, achieve
basic standards of hygiene and grooming, and appear able to
function in a work setting.  Id.  Dr. Kilbourne reported that

6

Deno's physical limitations meant that Deno could not work, and noted that Deno's restrictions were expected to last longer than ninety days.  Id. at 176.

On March 13, 2003, Deno reported back to Dr. Kilbourne for a gastroscopy.  Id. at 313.  Dr. Kilbourne observed that Deno had a history of chronic pain, vomiting, indigestion, difficulty maintaining weight, and a previous history of a near-total gastrectomy with at least half of his stomach removed due to bleeding ulcers.  Id. at 313.  He noted that Deno continued to struggle maintaining his weight.  Id.  Dr. Kilbourne further noted that Deno had a normal esophagus, free reflux, an open esophagogastric junction, and typical chronic inflammation and redness.  Id.

On June 24, 2003, Deno saw Dr. Edward G. Hixson ("Dr. Hixson") at Adirondack Medical Center due to postprandial pain. Id. at 238.  Deno underwent an ultrasound that revealed a polyp or stone within the gallbladder.  Id.  Dr. Hixson then performed a laparoscopic cholecystectomy, with a cystic duct chloangiogram that was unremarkable.  Id.  Dr. Hixson diagnosed Deno with (1) chronic gallstone disease, (2) intraabdominal adhesions after gastric surgery, and (3) depression.  Id.  Dr. Hixson noted that Deno was taking Paxil for his depression, "with good result." Id.

On December 10, 2003, Deno returned to Adirondack Medical Center, where Dr. Howard Novick ("Dr. Novick"), a radiologist, performed an MRI of Deno's lumbar spine. Id. at 228. The MRI revealed no obvious clumping of the intrathecal nerve to suggest arachnoiditis, no ominous osseous lesions, and no evidence of compression fractures or listhesis. Id. at 227. Dr. Novick reported that at the L1-L2, L2-L3, and L3-L4 levels, Deno had normal disc height and hydration with no evidence of focal disk herniation or spinal canal stenosis. Id. Dr. Novick found decreased hydration consistent with degenerative disc disease at the L4-L5 level and L5-S1 level. Id.

On February 2, 2004, Deno reported back to Adirondack Medical Center to see Scott Stoddard, a physical therapist, for degenerative disc disease at the L4-L5 and L5-S1 levels. Id. at 186. Deno reported that he had been suffering from lower back pain for two years, and that he has been unable to relieve his back pain except by changing his body position when pain occurs. Id. Deno also reported that his history of stomach pain had prevented him from returning to construction work since 2000, and that his lifestyle was quite sedentary due to the pain. Id. Deno was taking Nexium for his stomach pain at the time. Id. at 187.

Stoddard observed that Deno had stiff posture in his lower

and middle back.  Id. at 187.  He noted that Deno had negative

myotomes throughout the lower extremities, decreased lumbar

flexion and extension, and tenderness and muscle spasms

throughout the lumbar spine.  Id. at 187-88.  Stoddard concluded

that Deno presented signs of degenerative disk disease of the

lumbar spine, finding that Deno's "primary limitation at this

point is his decrease in motion and decrease in activity over

the past two years."  Id. at 188.  Specifically, Deno's

limitations included hesitancy to move, lack of motion, and

spinal tightness, but Stoddard predicted that Deno could improve

in rehab if he could work through some of the initial pain.  Id.

Stoddard set concrete goals for Deno's physical therapy, writing

that Deno "will be able to perform full extension of the lumbar

spine, as well as flexion, 80% to 90% of normal, without any

increase in pain in his lower extremity."  Id.

Between his initial consultation on February 2, 2004, and

March 4, 2004, Deno reported to the Adirondack Medical Center

for therapy eight times.  Id. at 190.  Deno reported that he was

experiencing vomiting and poor nutritional intake, but noted

that his back was doing well, though he experienced slightly

more back pain while feeling sick.  Id.  Stoddard reported that

Deno was "doing very well functionally and mobility-wise since

starting therapy," and that Deno's pain was steadily decreasing.

Id. at 191.  Stoddard also observed that Deno was performing his therapeutic exercises with increased tolerance, demonstrating relatively good core stability.  Stoddard noted "[i]t is not felt the patient will need much longer before he is able to return to a job that he had performed prior."  Id. at 191.

On July 21, 2006, Deno saw Dr. Wassef, the same internist who had performed an internal workup in December 2002, for an orthopedic examination.  Id. at 469.  The Division of Disability Determination referred Deno to Dr. Wassef, and Deno appeared with a legal assistant.  Id.  Deno reported three categories of symptoms.  Deno's chief complaint was his constant, massive headaches, which he had been experiencing for six months or more.  Id.  Deno reported that the headaches felt like something was pulling at the back of his head and neck, and he attributed the headaches to his lower back pain.  Id.  Second, Deno said that he had a history of bleeding peptic ulcer, reporting that he continued to experience nausea, heartburn, and frequent vomiting.  Id.  Third, Deno reported sharp pain in his lower back, which he had experienced for three to four years.  Id.

At this same appointment with Dr. Wassef, Deno reported that he did not smoke cigarettes, drink alcohol, or take street drugs.  Id. at 471.  He told the doctor that he lived alone and that he could not clean, do laundry, or shop because of his back

pain.  Id.  Deno further stated that he was able to shower
himself three times a week, bathe himself three times a week,
and dress himself every day.  Id.  In his free time, he enjoyed
watching television, listening to the radio, reading, and
socializing with his friends.  Id.  At the time, Deno was on
three medications: Prilosec, Famotidine, and Tramadol
hydrochloride/APA.  Id. at 470.  Deno was supposed to be on B12
vitamin injections, though he did not have his vitamin B12 with
him that day.  Id.

Dr. Wassef made several assessments based on his
examination.  He observed that Deno had a normal gait, but that
he seemed to experience discomfort during an examination of his
heels, toes, and upper extremities, as well as when squatting.
Id. at 471.  Dr. Wassef noted that Deno did not use an assistive
device, though Deno reported that Dr. Kilbourne had suggested
that he use a cane.  Id.  The doctor's report states that Deno
did not need assistance dressing himself or getting on and off
the examination table.  Id. at 471-72.  Dr. Wassef saw scratch
marks on Deno's legs, and observed three sets of scars in Deno's
abdominal area due to past surgeries.  Id. at 472.  Following
his examination, the doctor concluded that Deno's head, face,
eyes, ears, nose, throat, neck, chest, lungs, heart, and abdomen
were all normal.  Id.

Upon examination of Deno's musculoskeletal functioning, Dr. Wassef observed full flexion and extension, bilateral lateral flexion, and bilateral rotary extension, but noted that Deno's ability to flex and extend his lumbar spine was limited to a 70 degree movement. Id. at 473. Dr. Wassef also noted that Deno experienced discomfort during the examination of his thoracic and lumbar spine and his upper extremities. Id.

Dr. Wassef observed several positive indications of Deno's health. He reported that Deno had stable joints, full strength in his upper and lower extremities, and no swelling, effusion, heat, or redness. Id. The doctor further found that Deno had full hand and finger dexterity, as well as bilateral grip strength. Id. Dr. Wassef did not report any concerns about Deno's mental status, observing that Deno was dressed appropriately, maintained good eye contact, did not appear to have hallucinations or delusions, and denied suicidal ideation. Id. Based on his observations, Dr. Wassef concluded that Deno experienced discomfort in his lower back and mild to moderate limitations of flexion and extension movements of his lower back, though Dr. Wassef did not detect limitations of his hands, cervical spine, or either lower extremity. Id. at 474. Dr. Wassef recommended that Deno continue to follow up with Dr. Kilbourne and with the Spine Institute in Burlington, Vermont.

Id.

On November 21, 2006, four months after Dr. Wassef's examination, Deno saw Dr. Kilbourne for a disability examination following a referral from the New Your State Office of Temporary and Disability Assistance Department of Disability Determinations. Id. at 495. Deno was accompanied by a paralegal from his attorney's office. Id. Deno described his history of stomach pain, reporting that he was unable to work due to repeated episodes of vomiting and abdominal pain. Id. He also reported heartburn and emesis, which Dr. Kilbourne noted he had never witnessed. Id. at 496. Deno also reported lower back pain when he sits down and stands up. Id. Dr. Kilbourne observed that Deno "does almost no work at this point in time, so it is difficult to ascertain just how much he could lift or whether he has any pain with lifting since he doesn't do any work at all." Id. Deno reported that he spends his time "pretty much lounging around the house and watching TV." Id.

Dr. Kilbourne noted that Deno had normal health in several respects. He also observed that Deno's gait and heel to toe walking appeared normal. Id. While walking, Deno did not display any imbalance or difficulties with his back. Id. Dr. Kilbourne noted that Deno was "tensing his abdomen quite a lot but when his gut relaxed his abdomen appeared to be soft in all

13

areas." Id. On the subject of Deno's stomach pain, Dr.

Kilbourne noted that Deno appeared to have chronic epigastric

and abdominal pain that was most likely related to some mild

adhesive disease. Id. at 497. Dr. Kilbourne described Deno as

"thin but well nourished." Id. Summarizing his observations

for the disability report, Dr. Kilbourne stated that:

> It would be hard to imagine total disability regarding
> either of the above conditions [back pain and stomach
> pain]. There is little objective evidence to suggest
> any continuing problems with adhesions and the stomach
> problem appears to be [a] fairly normal remnant
> following sub total resection. . . . It appears [Deno]
> could do moderate work regarding his back and in the
> presence of lack of any difficulty with maintaining
> weight or clear obstructive symptoms it appears that
> he could maintain some sort of work activity regarding
> his stomach or gastric remnant.

Id. at 497.

On November 21, 2006, Deno saw Dr. David Meeker, Ph.D.

("Dr. Meeker"), a psychologist, for a consultative evaluation.

Id. at 488. A representative from Deno's attorney's office

accompanied him during the consultation. Id. The consultation

began with Deno describing his history of back and stomach pain.

Id. He denied taking any psychotropic medication. Id. at 489.

Deno also denied any past or present difficulties with drug or

alcohol abuse, id., though this Court notes that this is

slightly contradicted elsewhere in the record by Deno's

statements that he has a history of alcoholism but has not drunk

in a number of years.  Id. at 789.  When asked about his

vocational history, Deno stated he last worked in 2000, when he

performed "odd jobs" such as raking leaves and mowing lawns.

Id. at 489.  Deno reported that he "has lost jobs in the past

because he could not attend work on a regular basis due to

physical problems and sickness."  Id.

   Dr. Meeker ultimately determined that Deno's prognosis was

"fair to good."  Id. at 491.  Upon examination of Deno's mental

status, Dr. Meeker reported that Deno had an "agreeable and

pleasant" manner, noting that his dress and hygiene were normal.

Id. at 489.  Dr. Meeker noted that Deno offered little detail in

his responses.  Id.  Dr. Meeker observed that Deno admitted to

anhedonia, or an inability to experience pleasure from

activities usually found enjoyable.  Id.  Deno described

symptoms such as trouble sleeping, lack of appetite, low energy,

fear in public, difficulty making decisions, and feeling sad

most of the time.  Id.  Deno denied having hypomanic symptoms,

panic attacks, obsessive or compulsive symptoms, or ever

experiencing or witnessing extreme traumatic events.  Id. at

489-90.  Deno admitted that he went to jail for ten days for

failing to pay child support in 1990, but denied any other legal

problems.  Id. at 490.  Dr. Meeker concluded that Deno had no

problems understanding, remembering, and carrying out short,

simple instructions, but that he had a slightly impaired ability to understand, remember, and carry out detailed instructions. Id. at 492.

On April 18, 2007, Deno reported to Alice Hyde Medical Center for a routine medical examination with Dr. Giuseppe Ventre ("Dr. Ventre"). Id. at 798. Deno reported chronic stomach pain, nausea, vomiting, significant weight loss, inability to eat even small meals, and a history of back pain. Id. Dr. Ventre observed that Deno had lost over eighty pounds in the past twenty years, noting that Deno weighed 136 pounds at the time of his visit. Id. at 799. The doctor also noted that Deno "appears significantly older than his stated age," adding that Deno is "thin, cachectic, and [of] rather flat affect." Id. Dr. Ventre determined that Deno had "significant concern here for ongoing peptic ulcer disease and associated anorexia." Id.

On February 29, 2008, Deno saw Dr. Anthony Lombardi ("Dr. Lombardi") at the Alice Hyde Medical Center, complaining of pain in his left knee. Id. at 752. Dr. Lombardi reported that an x-ray of Deno's knee revealed mild medial compartment degenerative changes with trace joint effusions. Id. He determined that Deno had a degenerative condition in the left knee that caused him some pain when he walked. Id.

From May 21, 2008, through July 23, 2008, Deno saw Dr.
Shiao Ang Shih ("Dr. Shih") at Alice Hyde Medical Center
multiple times. Id. at 746-51, 790-95. On May 21, 2008, Deno
saw Dr. Shih and reported right thigh lateral pain and lower
back pain. Id. at 794. Dr. Shih recommended that Deno continue
treatment, avoid activities which cause him pain, and try some
gentle walking. Id. at 795. During the exam, Deno was not in
acute distress and was able to move to the exam bed and lie down
without significant difficulty. Id. at 750. Dr. Shih also
noted that Deno's straight leg raising was negative in his right
lower extremity. Id. Following a visit on June 18, 2008, Dr.
Shih reported that Deno had a Vitamin B12 deficiency, but his
chronic low back pain had improved. Id. at 748. During this
June visit and a follow-up appointment on July 18, 2008, Deno
complained of increased lower back pain radiating to the
posterior thigh for about one week. Id. at 790, 792. After the
July visit, Dr. Shih determined that Deno had chronic low back
pain with radiculopathy, recommending that Deno slow down and
relax when his pain increases, and renewing Deno's prescription
for Flexeril. Id. at 746.

On September 3, 2008, Deno saw nurse practitioner Brenda
Lepage ("Lepage") for a follow-up on lab work examining Deno for
anemia, prostate screening, and hyperlipidemia. Id. at 788.

17

Deno reported that while on occasion he was too nauseous to get out of bed, the majority of the time he felt able to tolerate the nausea and to "deal with it." Id. Deno also told Lepage that he had a history of alcoholism but that he has not drunk in a number of years. Id. at 789. Lepage found that Deno was not in acute distress, and diagnosed Deno with chronic nausea and chronic low back pain. Id.

On October 7, 2008, Deno returned to Dr. Shih complaining of a painful nodule in the right scrotum, a problem that Deno had not experienced in the past. Id. at 786. Dr. Shih assessed that Deno had a "right scrotum lump" that was "probably [a] spermatocele or spididymal cyst." Id. at 787.

Deno visited Dr. Shih again on January 12, 2009, complaining of persistent lower back pain, left knee pain, and right scrotum pain. Id. at 732. Deno described the pain as a seven on a scale of one to ten. Id. Dr. Shih diagnosed Deno with chronic back pain, left knee pain, Vitamin B12 deficiency, and a right epididymal cyst. Id.

On March 9, 2009, Deno returned to Lepage to follow up on a laboratory test done for hypertension, anemia, and hyperlipidemia, as well as complaints of nausea, vomiting, lightheadedness, and intermittent testicular pain. Id. at 730.

On April 29, 2009, Deno returned to Dr. Wassef, the

internist who he first saw in December 2002. Id. at 170, 754.
Deno stated that he "is always in pain," citing severe headaches
for the prior four years, a history of bleeding peptic ulcer,
nausea, heartburn, occasional vomiting, and constant lower back
pain for almost seven to eight years, radiating to his right
leg. Id. at 754-55. Deno used a cane as prescribed by Dr.
Kilbourne. Id. at 756. Deno reported that he experiences no
limitations in his daily activities, which include cooking once
or twice a week, cleaning once a week, doing laundry every two
weeks, showering once or twice a week, bathing once or twice a
week, and dressing himself every day. Id.

Dr. Wassef observed that Deno appeared to be in discomfort
and pain. Id. He diagnosed Deno with (1) headaches attributed
to lower back pain, (2) a past history of peptic ulcer disease,
(3) lower back pain, (4) degenerative disease at L4/L5 and
L5/S1, (5) a past history of cholecystectomy, and (6) a past
history of cyatoscopy retrograde study and right upper lobe
nephrectomy with subtotal ureterectomy. Id. at 758. Dr. Wassef
reiterated that Deno was in discomfort during the examination of
his lower back, upper extremities, and cervical spine. Id. at
758-59.

On June 2, 2009, Dr. Bodnar, an internist for the New York
State Office of Temporary and Disability Assistance, saw Deno in

response to his request for disability assistance due to stomach and back pain. Id. at 761. Dr. Bodnar determined that Deno had degenerative disease with some disc space narrowing in his back, but observed that Deno was healthy neurologically and that his strength and sensory abilities were intact. Id. He wrote that Deno had many pain complaints and behaviors but noted that there were little objective findings supporting these complaints. Id. Dr. Bodnar reported that Deno could stand and walk two out of eight hours of a day, sit for six out of eight hours a day, carry ten pounds, and occasionally stoop and bend. Id.

On June 30, 2010, Deno saw Lepage at Alice Hyde Medical Center to follow up on laboratory work for anemia, lipid screening, and elevated liver functions. Id. at 621. Deno reported that he had been feeling quite well, and that "he has really not had much nausea or vomiting." Id. Lepage recommended that Deno continue to follow up for his anemia, prescribed Zantac for dyspepsia, and gave refills of Tramadol and Flexeril for chronic lower back pain. Id. at 622.

Deno saw Lepage again on July 23, 2010. Id. at 619. Lepage did not conduct a physical examination that day; she reported that she and Deno spent ten minutes out of the fifteen together discussing Deno's depression. Id. at 620. Lepage recommended Zoloft and encouraged Deno to call if he had any

issues.  Id.

On October 20, 2010, Deno saw Dr. David Welch ("Dr. Welch")
for a Social Security Examination.  Id. at 807.  The visit
focused on two ongoing medical problems: back pain and
gastrointestinal issues.  Id.  First, Dr. Welch described Deno's
experiences with chronic back and knee pain, which Dr. Welch was
asked to examine from an orthopedic perspective.  Id.  Dr. Welch
found an MRI from December 10, 2003, which showed degenerative
disc disease at L4-L5 and L5-S1 as well as right paracentral
herniation at L4-L5.  Id.  An additional exam showed that Deno's
lumbar spine was flattened and had lost normal lordosis.  Id. at
808.  Dr. Welch found that Deno had nontender knees, no sign of
joint effusion or degenerative changes, and no feet and ankle
problems to the extent of his knowledge.  Id.  He added that
Deno was "a gentleman who clearly suffers from chronic back
pain."  Id.

Turning to Deno's stomach issues, Dr. Welch observed that
Deno has experienced chronic gastrointestinal problems following
his partial gastrectomy, including nausea, vomiting, and limited
tolerance of food intake.  Id. at 807.  Deno reported that he
vomited at least twice a day for more than twenty years.  Id.
The doctor noted that because of his gastrectomy, Deno would
likely be unable to treat his stomach issues with anti-

inflammatory medication.  Id. at 809.  He further observed that
Deno was extremely thin, and noted that he looked significantly
older than his age of 42.  Id. at 808.

In addition to evaluating Deno's medical status, Dr. Welch
noted that Deno's work history consisted of only very short-
term, temporary, and relatively menial jobs which he constantly
lost due to back pain or nausea and vomiting.  Id. at 807.  Dr.
Welch also completed a form detailing his assessment of Deno's
ability to do physical work-related activities.  Id. at 810.  He
wrote that Deno could occasionally lift or carry up to ten
pounds, but that Deno could never lift or carry more than eleven
pounds.  Id.  The doctor also determined that Deno could sit for
one hour at a time, and that he could stand or walk for thirty
minutes at a time.  Id. at 811.  Dr. Welch found that during an
eight hour work day, Deno could sit for four hours, stand for
two hours, or walk for one hour.  Id.  The report also notes
that Deno did not require the use of a cane to walk.  Id.  Dr.
Welch reported that Deno could perform all activities with both
hands frequently, including reaching, handling, fingering,
feeling, pushing, and pulling.  Id. at 812.  He observed that
Deno could occasionally climb stairs and ramps and balance
himself, but that he could never climb ladders or scaffolds,
stoop, kneel, crouch, or crawl due to his ongoing back pain.

Id. at 813.

In addition, Dr. Welch reported that Deno could occasionally tolerate exposure to moving mechanical parts, operation of motor vehicles, humidity and wetness, extreme cold, and extreme heat, but that he could never tolerate unprotected heights or vibrations.  Id. at 814.  The doctor also concluded that Deno could shop, travel without a companion for assistance, ambulate without the use of a wheelchair, walker, two canes, or two crutches, use standard public transportation, prepare simple meals and feed himself, care for personal hygiene, and sort, handle, or use papers.  Id. at 815.  Finally, Dr. Welch noted that Deno could not walk a block at a reasonable pace on rough or uneven surfaces, or climb a few steps at a reasonable pace with the use of single handrail.  Id.

On November 19, 2010, at the request of a hearing officer, Dr. Kilbourne wrote a letter to the Social Security Administration.  See id. at 818.  Dr. Kilbourne wrote that he had filled out a form for Deno in his capacity as a private physician in 2003, but that he did not recall anything regarding that visit and that he did not have records available.  Id.  He added that he saw Deno again in 2006 in his capacity as an examiner for the New York State Office of Temporary and Disability Assistance, and noted that further investigations

"showed no evidence of any condition which he considered totally disabling." Id. Dr. Kilbourne concluded that he did not feel that he could fill out any further forms as he had not seen the patient in four years and the situation could have changed. Id. at 818-19.

### 2. Testimony

Deno has attended three hearings regarding his SSI benefits. Deno first attended a hearing about his benefits on October 21, 2004. See id. at 557. At that time, he was 36 years old and was married but separated from his wife. Id. at 559-60. Deno stated that he received no income at all, and that he survived only on food stamps and Medicaid. Id. at 560. He testified that he lived in a studio apartment and had a driver's license, which he used to drive his cousin's car a couple of times a month. Id. Deno described his educational history and vocational history, as well as his history of stomach problems and back pain, stating that his stomach problems and back pain made it impossible for him to hold a job. Id. at 561-63. He said that his pain makes it a struggle to get out of bed every morning, and that it was a struggle to live his everyday life. Id. at 565.

On May 2, 2007, Deno attended another hearing concerning his SSI benefits. See id. at 504-43. Deno described his

education, medical history, and prior work history.  Id. at 507-14.  Deno also described his initial operation for bleeding ulcers around age eighteen, id. at 509, his weight loss (down from 260 pounds to around 135-145 pounds since his first surgery), id. at 511, and his history of spinal degenerative disease, id. at 514.  Deno explained that he lost his job at Waste Stream Management in the early 1990s because he often missed work due to stomach pain and frequent vomiting.  Id. at 513.  Deno stated that his only job other than his job at Waste Stream Management was working for his brother as a light laborer.  Id. at 512, 514.  Also at the hearing of May 2, 2007, Deno's attorney objected to Dr. Kilbourne's letter, describing it as "not credible" and "prejudicial" because Dr. Kilbourne had been paid to give the report even though he was a treating physician and because the doctor had failed to cite to his own previous records.  Id. at 506-07.

On July 14, 2010, Deno attended a third hearing pertaining to his SSI benefits.  Id. at 820.  Deno reported that he had been seeing Dr. Kilbourne about once a month for fifteen or twenty years regarding his peptic ulcer disease.  Id. at 823-24.  Deno described his physical limitations, which he said had been getting progressively worse.  Id. at 824-25.  He stated that three or four years ago he could walk and stand for about thirty

minutes, but that today he could only sit and stand for five to
fifteen minutes.  Id. at 825.

Deno told the hearing officer that he had been employed as
a "go-for" for about two months in 2007 at the 4C Air and Pot
Stand, where his brother worked.  Id. at 825-26.  During his
time as an employee there, Deno worked about thirty hours a week
at a rate of eight dollars an hour.  Id. at 826, 829.  He
described his tasks as sweeping up and getting tools for the
heavier laborers at the construction site.  Id. at 827-28.  Deno
was eventually laid off from the job because of "lack of
productions"; he explained that out of a work week he might miss
three or four days because of vomiting and back pain.  Id. at
829.  After detailing this work history, Deno described his
anxiety, stating that when there are a lot of people around he
gets upset and wants to be alone.  Id. at 832, 834-35.  When
asked how long he felt he had suffered from anxiety, Deno stated
that he did not think that he was "that bad."  Id. at 835.

In addition, Deno described his everyday routine.  Deno
testified that he usually gets up around 8:00 or 9:00 am, and
that he usually hangs around the house for a couple of hours.
Id. at 837.  He tends to cook himself lunch and dinner, clean
what he can, read, listen to music, watch TV, and occasionally
go to the store with the help of others.  Id. at 836-37.

26

Deno then stated that he stopped seeing Dr. Kilbourne a few years ago after his brother recommended that he see another doctor because his brother did not think Dr. Kilbourne was helping Deno's condition.  Id. at 843-44.

**II.  LEGAL STANDARD**

Federal district courts "have [the] power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g); Laven v. Astrue, No. 1:10-CV-01360 (NPM), 2011 WL 6318360, at *3 (N.D.N.Y. Dec. 15, 2011) (McCurn, J.).

**A.  Standard of Review**

Federal district courts exercise the same standard of review for social security benefits as do the courts of appeals. Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996) (citing Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991)).  In general, the factual findings of the hearing officer "are conclusive unless they are not supported by substantial evidence."  Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995) (citing 42 U.S.C. § 405(g)).  Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Pratts v. Chater,

94 F.3d 34, 37 (2d Cir. 1996) (quoting Richardson v. Perales,

402 U.S. 389, 401 (1971)) (internal quotation marks omitted);

see also Universal Camera Corp. v. NLRB, 340 U.S. 474, 477

(1951).

Legal decisions are reviewed de novo, and "[w]here there is

reasonable doubt as to whether the Commissioner applied the

proper legal standards, his decision should not be affirmed even

though the ultimate conclusion reached is arguably supported by

substantial evidence." Whipple v. Astrue, No. 5:08-CV-1356

(GTS/DEP), 2011 WL 1299352, at *5 (N.D.N.Y. Mar. 8, 2011)

(Peebles, M.J.) (citing Martone v. Apfel, 70 F. Supp. 2d 145,

148 (N.D.N.Y. 1999) (Hurd, J.)).

**B.    Social Security Standard**

A claimant is disabled for the purposes of SSI eligibility

if he is "[unable] to engage in any substantial gainful activity

by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not

less than 12 months." Petrie v. Astrue, 412 F. App'x 401, 404

(2d Cir. 2011) (quoting 42 U.S.C. § 423(d)(1)(A)) (internal

quotation marks omitted).

The Social Security Administration has promulgated a

five-step sequential evaluation process to determine whether a

claimant is disabled.  See 20 C.F.R. § 404.1520(a)(4).  The
hearing officer must determine: (1) whether the claimant is
engaged in substantial gainful activity; (2) whether the
claimant has a severe impairment; (3) whether the impairment
meets or medically equals an impairment listed under 20 C.F.R.
Part 404, Subpart P, Appendix 1, and meets the duration
requirement; (4) whether the claimant has the residual
functional capacity to perform his past relevant work; and (5)
whether the impairment prevents the claimant from doing any
other work, considering the claimant's age, education, and work
experience.  Id.

The claimant bears the burden of proof on the first four
steps, while the Commissioner bears the burden on the last step.
See Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008).  The
steps ought be followed in order.  20 C.F.R. §§ 404.1520(a),
416.920(a)(4).

**III. THE HEARING OFFICER'S DECISION**

On December 28, 2010, the hearing officer determined that
Deno had not been under a disability within the meaning of
section 1614(a)(3)(A) of the Social Security Act since September
30, 2002, the date his application was filed.  Admin. R. 633-
644.

Applying the five-step test set out in 20 C.F.R. § 404.1520,

the hearing officer determined that Deno's claim failed to meet the standards for determining whether a claimant is disabled. The hearing officer determined that Deno satisfied the first prong, finding that Deno had not engaged in substantial gainful activity since September 30, 2002. Admin. R. 635. The hearing officer also determined that Deno satisfied the second prong, holding that Deno's peptic disease, back pain, and depression constituted severe impairments. Id. On the third prong, the hearing officer found that Deno did not have an impairment or combination of impairments that met or medically equals one of the impairments under 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. at 637-39. Accordingly, Deno was not entitled to a finding that he was per se disabled. See id.

The hearing officer then turned to the fourth and fifth prongs to evaluate Deno's ability to work in the future. On the fourth prong, which addresses whether the claimant has the residual functional capacity to perform his past relevant work, the hearing officer found that Deno lacked this capacity. Id. at 643. Moving to the fifth and final step of the analysis, however, the hearing officer determined that Deno possessed the residual functional capacity to perform other jobs that exist in significant numbers in the national economy. Id. Considering Deno's age, education, work experience, and residual functional

capacity, the hearing officer determined that Deno was capable

of perform jobs such as products assembler, packer, and

messenger.  Id. at 644.  Accordingly, the hearing officer found

that Deno was not disabled and was not entitled to benefits.

Id.

**IV.  ANALYSIS**

Deno asks this Court to rule that the hearing officer's

determination that he is not disabled is not supported by

substantial evidence.  Deno argues that the hearing officer

committed reversible error by (1) failing to meet his burden of

proof at step five that Deno could perform work in the national

economy, (2) failing adequately to consider the inconsistency in

Dr. Kilbourne's reports of 2003 and 2006, (3) violating the

rules regarding the correct weight allocated to medical

providers in denying benefits, (4) failing adequately to support

his credibility determination, (5) failing adequately to support

his residual functional capacity determination, and (6) erring

in accepting the vocational expert's testimony from 2007 that

Deno could not work.  Deno's Mem. 20-35.  The Court will address

each of these arguments in turn, though it deals with them out

of order and (in some cases) grouped together.


**A.    Failure to Accord the Proper Weight to Medical**

**Providers and Failure Adequately to Consider the
Inconsistency in Dr. Kilbourne's Reports**

Deno contends that the hearing officer failed to accord the
proper weight to medical providers, and in particular that the
hearing officer erred by discounting the exam of Dr. Welch and
the 2003 report prepared by Dr. Kilbourne.  Id. at 24-25.  Deno
also contends that the hearing officer erred when he failed to
comply with the remand order to contact Dr. Kilbourne regarding
inconsistencies in his reports.  Id. at 21-22.

When deciding how much weight to give to the reports of
various medical professionals in the record, the hearing officer
must apply the "Treating Physician Rule," which requires that the
treating physician's opinion regarding the severity of the
impairments be granted controlling weight if the opinion is well
supported by medical findings and is otherwise not inconsistent
with other substantial evidence in the record.  The Commissioner
generally:

> [G]ive[s] more weight to opinions from [a claimant's]
> treating sources . . . .  If [the Commissioner]
> find[s] that a treating source's opinion . . . is
> well-supported by medically acceptable clinical and
> laboratory diagnostic techniques and is not
> inconsistent with the other substantial evidence in [a
> claimant's] case record, [she] will give it
> controlling weight.

20 C.F.R. § 416.927(c)(2); see also Rosa v. Callahan, 168 F.3d
72, 78-79 (2d Cir. 1999).  The hearing officer must "give good

reasons" to explain the weight given a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); Longbardi v. Astrue, No. 07 Civ. 5952 (LAP), 2009 WL 50140, at *27 (S.D.N.Y. Jan. 7, 2009)(noting that if the hearing officer's decision denies the claimant benefits, it must "be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion" (quoting Disarno v. Astrue, No. 06-CV-0461-JTC, 2008 WL 1995123, at *4 (W.D.N.Y. May 6, 2008)) (internal quotation mark omitted)).

The hearing officer must analyze a series of factors in order to support a determination that the treating physician's opinion is not entitled to controlling weight. Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000)(citing Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998)). These factors include "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." Id. (internal quotation marks omitted). When examining a treating physician's opinion, the hearing officer "cannot arbitrarily substitute his own judgment for competent medical opinion." Rosa, 168 F.3d at 79 (quoting McBrayer v.

33

<u>Sec'y of Health & Human Servs.</u>, 712 F.2d 795, 799 (2d Cir. 1983)) (internal quotation marks omitted).

In the present case, the hearing officer referenced the findings of a range of Deno's treating physicians, including Dr. Kilbourne, Admin. R. 635-36, 639-42, Dr. Hixson, <u>id.</u> at 635, Dr. Wassef, <u>id.</u> at 636-37, 642, Dr. Welch, <u>id.</u> at 637, 642-43, and Dr. Meeker, <u>id.</u> at 637-38. The hearing officer determined that Dr. Kilbourne's assessment is "entitled to controlling weight pursuant to 20 C.F.R. § 416.927." <u>Id.</u> at 642. The hearing officer also gave significant weight to the reports of Dr. Wassef and Dr. Meeker. <u>Id.</u> Dr. Welch's opinion, however, was found to be of "little probative value." <u>Id.</u>

Again, Deno contends that the hearing officer failed to accord the proper weight to medical providers, particularly Dr. Welch and the earliest report provided by Dr. Kilbourne, Deno's Mem. 25, and that the hearing officer erred when he failed to comply with the remand order to contact Dr. Kilbourne regarding inconsistencies in his reports. <u>Id.</u> at 21-22. This Court holds that neither of Deno's contentions is persuasive.

First, the hearing officer explained why and how he weighed Dr. Welch's evidence as required under 20 C.F.R. § 416.927. <u>See</u> <u>Carlantone</u> v. <u>Astrue</u>, No. 08 Civ. 07393(SHS), 2009 WL 2043888, at *5 (S.D.N.Y. July 14, 2009) ("The [hearing officer] is

required to explain why and how he weighed the evidence, especially if the opinion of the treating physician is not given controlling weight." (citing 20 C.F.R. § 416.927)). He explained that Dr. Welch's findings appeared "grossly inconsistent with both treating and examining opinions as well as diagnostic studies," an observation supported by the record. Admin. R. 642. The hearing officer further noted that Dr. Welch suspected significant degenerative disc disease, while the x-ray examination identified no more than slight disc space narrowing. Id. at 642-43. Accordingly, this Court rules that the hearing officer met his burden of explaining why and how he weighed Dr. Meeker's report, and that the weight he accorded is supported by substantial evidence in the record.

Second, contrary to Deno's contentions, Deno Mem. 21-22, the hearing officer complied with the remand order to contact Dr. Kilbourne regarding inconsistencies in his reports. Admin. R. 649-50. In November 2010, pursuant to the remand order, Dr. Kilbourne clarified that when he examined Deno in 2003, he found that Deno could not work because of Deno's complaints of severe peptic ulcer disease, anemia, and B12 deficiency. Id. at 818. Dr. Kilbourne explained that three years later, he again saw Deno, who "at that point in time had fairly much the same complaints regarding his stomach but over the three years had

not deteriorated." Id. He added that "[f]urther investigations
had been done and showed no evidence of any condition which I
considered totally disabling." Id.

The hearing officer discussed both Dr. Kilbourne's 2003 and
2006 reports. Id. at 635, 639-40. Furthermore, the hearing
officer expressly addressed the remand order regarding
inconsistencies in Dr. Kilbourne's reports before according Dr.
Kilbourne's findings controlling weight pursuant to 20 C.F.R. §
416.927. Id. at 642. Consider the hearing officer's
explanation of Dr. Kilbourne's response to the remand order:

> Pursuant to the remand order, Dr. Kilbourne was
> recontacted regarding his opinion of the claimant's
> functioning. He responded to the request for
> clarification in November 2010. He reports that in
> January 2003 the claimant was suffering from severe
> peptic ulcer disease, anemia and B12 vitamin
> deficiency. He determined that the claimant was not
> the capable of working, pending further work-up. The
> claimant was examined by Dr. Kilbourne as a
> consultative examiner in November 2006. He reports
> that the claimant had not experienced any
> deterioration. He conducted further investigations and
> found no evidence of any condition which he regarded
> as totally disabling. He stated that, although the
> claimant complained of back pain, there was no
> evidence that the claimant was, in fact, totally
> disabled from any work. Since that time, he has had
> no further contact with the claimant. Dr. Kilbourne
> notes that, after a visit during which he informed the
> claimant that he regarded him as capable of working,
> the claimant left the practice.

Id. at 640. The Court observes that, while not dispositive, the
Appeals Council's decision to deny review of the hearing

officer's treatment of these inconsistencies, id. at 572-73,
points in favor of this Court finding that the Appeals Council's
own remand order was handled appropriately.  Once the
inconsistencies in Dr. Kilbourne's reports were explained, the
hearing officer gave controlling weight to the 2006 report in
lieu of the 2003 one; in doing so, he noted the 2006 report's
consistency with both Dr. Kilbourne's 2010 clarification and
with Dr. Wassef's 2009 report – that is to say, he found that
the report was corroborated by other substantial evidence on the
record.  See id. at 642. Accordingly, this Court holds that the
hearing officer properly responded to the remand order
requesting clarification from Dr. Kilbourne, and that the
hearing officer's subsequent determination of the weight to
which Dr. Kilbourne's opinion was entitled was properly
explained and supported by substantial evidence.

> **B.    Failure Adequately to Support the Determination of
>        Deno's Credibility**

Deno contends that there is no substantial evidence in the
record to support a finding that his complaints are not
credible.  Deno's Mem. 26-29.  He claims that the hearing
officer did not properly recognize the allegations of chronic
stomach pain, back pain, and related serious impairments related
to the spine.  Id. at 27-28.  In addition, Deno also cites prior

diagnoses of depression, but states that he has never claimed that he could not perform work solely because of his depression and anxiety. Id. at 28.

In evaluating a claimant's residual functional capacity, the hearing officer is "required to take the claimant's reports of pain and other limitations into account" but is "not required to accept the claimant's subjective complaints without question." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 416.929). Rather, the hearing officer "may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." Id. (citing Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979)).

The regulations outline a two-step process for assessing claims of subjective pain. Id. At the first step, the hearing officer "must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." Id. (citing 20 C.F.R. § 404.1529(b)). If the claimant suffers from such an impairment, the second step requires the hearing officer to determine "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record." Id. (alteration in

original) (quoting 20 C.F.R § 404.1529(a)) (internal quotation
marks omitted).

The Court rejects Deno's argument because the hearing
officer's credibility determination is supported by substantial
evidence. Following the two-step process, the hearing officer
first determined that Deno's medically determinable impairments
reasonably could be expected to cause the alleged symptoms.
Admin. R. 642. The hearing officer then found, however, that
Deno's "statements concerning the intensity, persistence and
limiting effects of these symptoms are not entirely credible."
Id.

Although the hearing officer acknowledged that Deno's
history of peptic disease, back pain, and depression were severe
impairments, id. at 635, the hearing officer also noted that
Deno's statements about his daily activities and the reports of
his doctors do not corroborate his allegations of a complete
inability to work. Id. at 641-43. The record shows that Deno's
daily activities include reading, cooking for himself, showering
and bathing himself, cleaning his home, watching TV, going out
with friends, doing crafts, focusing on puzzles, dressing
himself every day, doing laundry every two weeks, and listening
to the radio. Id. at 171, 756, 838-40. Additionally, Dr.
Kilbourne, Dr. Wassef, Dr. Bodnar, Dr. Meeker, and Dr. Welch

found limited restrictions of Deno's capability to perform daily tasks and no limitations on Deno's mental functioning.  Id. at 173, 474, 491-92, 497, 761, 810-15.  Because the hearing officer adequately measured Deno's subjective claims of pain against this objective medical evidence, then, the Court rules that the hearing officer's determination that Deno's claims were not credible was permissible.

### C. Failure Adequately to Support the Residual Function Determination and Failure Adequately to Support the Determination that Deno Could Perform Work in the National Economy

At the fourth and fifth steps of the sequential evaluation process, the hearing officer is required to determine whether the claimant has the residual functional capacity to perform his past relevant work or alternative work in the national economy. While Deno bears the burden of proof for the first four steps, the Commissioner bears the burden on the fifth step.  Burgess, 537 F.3d at 128.  Deno contends that the Commissioner did not meet her burden on the fifth step of the evaluation process in determining that Deno had the residual functional capacity to perform jobs that exist in significant numbers in the national economy.  Deno's Mem. 20-21.

Deno makes two arguments on this point: (1) that the residual functional capacity determination cannot be sustained

because he is unable to perform any work due to his combination of impairments and non-exertional limitations, and (2) that Deno should be deemed disabled because the Commissioner did not met her burden of proof at step five that Deno could perform work in the national economy. Deno's Mem. 20-21, 31. On the first contention, Deno states that he has been unable to perform sedentary or light work on a full-time basis since 2002, that he suffers from severe back pain and depression, and that he has never been able to hold a job because of his nausea and vomiting. Id. at 31-32. On the second contention, Deno states that the Commissioner did not produce any evidence that Deno was affirmatively able to work. Id. at 20-21.

The Court rejects both of Deno's arguments because the hearing officer's residual functional capacity determination is supported by substantial evidence. The hearing officer's residual functional capacity determination "must be set forth with sufficient specificity to enable [the Court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) (citing Treadwell v. Schweiker, 698 F.2d 137, 142 (2d Cir. 1983)). It is, however, "not require[d] that [the hearing officer] have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or

insufficient to lead him to a conclusion of disability."
Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983); see also
Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981) (rejecting the
proposition that the hearing officer must explicitly reconcile
"every shred" of conflicting testimony).

As discussed above in the sections dealing with the weight
and credibility given to various medical and testimonial
evidence, the hearing officer had ample grounds on which to
decide that Deno retailed the residual functional capacity to
carry out some kind of work.  Turning specifically to his
analysis under step five, the hearing officer found that
"[c]onsidering the claimant's age, education, work experience,
and residual functional capacity, there are jobs that exist in
significant numbers in the national economy that the claimant
can perform."  Admin. R. 643.  This determination was supported
by the findings of a vocational officer, who testified that
given Deno's age, education, work experience, and residual
functional capacity, Deno would be able to work as a products
assembler, packer, and messenger, each of which is a job that
exists in substantial numbers.  Id. at 643-44.  This evidence –
the validity of which is confirmed in the following section –
was sufficient for the hearing officer to find that the
Commissioner had met her burden at step five and that Deno was

thus not disabled.

**D.   Improper Reliance on the Vocational Expert's Testimony**

The final issue is whether the hearing officer's acceptance of the vocational expert's testimony from 2007 constitutes legal error.  The hearing officer is vested with discretion regarding whether to use a vocational expert.  20 C.F.R. § 404.1566(e); <u>Webb</u> v. <u>Astrue</u>, No. 3:11-CV-94 (GLS), 2012 WL 589660, at *5 (N.D.N.Y. Feb. 22, 2012); <u>Bapp</u> v. <u>Bowen</u>, 802 F.2d 601, 603 (2d Cir. 1986) ("[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines.").

At Deno's hearing on May 2, 2007, the hearing officer consulted a vocational expert.  Admin. R. 531-43.  In response to hypothetical questions, the vocational expert testified that considering Deno's impairments, Deno would be able to perform the job of assembly production, <u>id.</u> at 537, hand packer, <u>id.</u> at 538-39, messenger, <u>id.</u> at 539, mail clerk, <u>id.</u> at 540, parking lot attendant, <u>id.</u>, and ticket taker, <u>id.</u>  The vocational expert also testified to the number of available positions in each field, nationally and regionally.  <u>Id.</u> at 537-43.

At Deno's trial of December 28, 2010, the hearing officer referenced parts of the vocational expert's 2007 testimony.  <u>Id.</u> at 643-44.  Specifically, the hearing officer referenced the

43

vocational officer's testimony that Deno would be able work as a products assistant, a packer, and a messenger, and that these jobs existed in significant numbers both nationally and regionally.  Id. at 644.

Deno contends that the hearing officer's 2010 decision should be reversed because the hearing officer relied on the 2007 testimony of a vocational expert without alerting Deno of this reliance or giving Deno a chance to cross-examine the expert using evidence that had been developed since her original testimony.  Deno's Mem. 34-35.  To support this argument, Deno cites Townley v. Heckler, 748 F.2d 109, 114 (2d Cir. 1984).  In Townley, the Second Circuit held the hearing officer violated the claimant's due process and committed reversible error by relying on vocational expert testimony that had been adduced only after the claimant's hearing had concluded.  Id.  The court also stressed that the claimant had never had an opportunity to examine the expert's report or send the expert interrogatories. Id.

Deno's reliance on Townley is misplaced.  Unlike in that case, where the claimant had no opportunity whatsoever to cross-examine the vocational expert, Deno was able to ask questions of the expert at his original hearing in 2007.  Furthermore, substantial evidence supports the hearing officer's implicit

44

finding that the vocational expert testimony from 2007 remained relevant to the case three years later.  At the 2010 hearing, for example, Deno himself testified that his limitations were substantially the same since his initial hearing, when the vocational expert's opinion was presented and examined.  Admin. R. 825 ("[P]robably the same amount of limitations but probably just a bit more – talking like, like half-hour of walking . . .").  Given Deno's own admission that little had materially changed since he cross-examined the vocational expert, then, this Court declines to rule that the hearing officer's reliance in 2010 on expert testimony from 2007 without any additional cross-examination violated Deno's right to due process or constituted reversible error.

## V.    CONCLUSION

Thus, for the foregoing reasons, it is hereby ORDERED that Deno's motion for judgment on the pleadings, ECF No. 1, 12, is DENIED; that the Commissioner's motion for judgment on the pleadings, ECF No. 13, is GRANTED; that the hearing officer's decision denying disability benefits is AFFIRMED; and that Deno's complaint, ECF No. 1, is DISMISSED.

**SO ORDERED.**

_/s/ William G. Young_
WILLIAM G. YOUNG
U.S. DISTRICT JUDGE